**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 1:22-cv-22534**

| | |
|---|---|
| New Vision Unlimited, LLC d/b/a Vision Unlimited., individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>vs.<br><br>Glasses USA, Inc.,<br>GlassesUSA Fulfillment Center Inc.,<br>GlassesUSA Retail, Inc.,<br>Lens.com, Inc.,<br>Web Eye Care, Inc. and<br>Contact Lens King, Inc.<br><br>*Defendants*. | **CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**<u>Class Action Complaint</u>**

**I.      Introduction.**

1.      Defendants sell corrective contact lenses online.  They distribute online ads on Google and other search engines prominently advertising low prices.  The prices they advertise are far lower than the prices that Plaintiff and other honest contact lens retailers advertise.

2.      The low prices lure consumers in.  Consumers decide to buy their contacts from one of the Defendants.  And they conclude that Plaintiff and other honest contact lens retailers are trying to overcharge them.

3.      Consumers click on Defendants' ads and are redirected to Defendants' websites. Consumers fill out details about their prescriptions.  They upload a copy of that prescription.  They provide the address and contact information for their doctor, so the prescription can be verified. They enter their name, their shipping address, and their billing address.  Often, they create an account with the Defendant they are purchasing from.  And they provide their credit card or other payment information.

4.      Late in the checkout process, Defendants add a supposed "processing fee" to the order.  With the fee added, Defendants' prices are about twice as much as advertised.  And they are about the same as the prices honest retailers such as Plaintiff advertise, because that is the true market price.

5.      Defendants do everything they can to hide the extra fee on their checkout pages. Many times, this works: consumers do not even notice that the total amount they are being charged for the order is about the same as what they would have paid if they bought from Plaintiff or another honest retailer.

6.      Moreover, even consumers who notice the extra fee often still go through with the purchase.  Having put in all their information—their prescription, their doctor, their address, their payment information, and so forth—consumers don't want to start over.  And Defendants' prices

are the same (not more) than those of honest retailers.

7.     Either way, the result is the same.  Defendants' deceptive ads did their job. Consumers purchase from Defendants instead of Plaintiff and other honest retailers.  Plaintiff and other honest retailers lose sales and market share.  Defendants profit.

8.     This practice has been going on for years.  It has diverted hundreds of millions of dollars in sales to Defendants and away from honest retailers like Plaintiff.  And it has made Defendants and their unscrupulous owners major players in the contact lens industry.

9.     Defendants should not be allowed to continue to profit from deception.  Plaintiff brings this case, on behalf of himself and other honest retailers like him, to finally put an end to this.

## II.    Parties.

10.     Plaintiff New Vision Unlimited, LLC d/b/a Vision Unlimited ("Vision Unlimited") is a Florida Limited Liability Corporation with a principal place of business in Miami, Florida. Plaintiff provides optical goods and services including contact lens fittings and contact lens sales. Plaintiff operates seven locations in Coral Gables, Weston, Doral, Kendall, Kendallwood, FIU College, and Biscayne.  Plaintiff also owns and operates two websites that sell contact lenses online: https://www.glassesled.com/ and https://vuoptical.myeyestore.com/.

11.     Defendant Glasses USA, Inc is a Delaware Corporation with a mailing address at 954 Lexington Avenue, #537, New York, NY 10021.  Defendant GlassesUSA Fulfillment Center Inc. is a Delaware Corporation with a mailing address at 954 Lexington Avenue, #537, New York, NY 10021.  Defendant GlassesUSA Retail, Inc. is a Delaware corporation with a mailing address at 954 Lexington Avenue, #537, New York, NY 10021.  These entities are referred to collectively as "Glasses USA".  Glasses USA does business throughout the United States, including in the State of Florida.  Glasses USA sells contact lenses through their online retail store: https://www.glassesusa.com/.  Glasses USA sells contact lenses to consumers in the State of

Florida and ships contact lenses to consumers in the State of Florida.

12. Defendant Lens.com, Inc. is a Nevada corporation with a mailing address of P.O. Box 27740, Las Vegas, Nevada 89126. Lens.com does business throughout the United States, including in the State of Florida. Lens.com sells contact lenses through their online retail store: https://www.lens.com/. Lens.com sells contact lenses to consumers in the State of Florida and ships contact lenses to consumers in the State of Florida.

13. Defendant WebEyeCare, Inc. is a Pennsylvania corporation with a mailing address at 1 Canal Street, Suite 205, Bristol, PA 19007. Web Eye Care sells contact lenses through their online retail store: https://webeyecare.com/. Web Eye Care sells contact lenses to consumers in the State of Florida and ships contact lenses to consumers in the State of Florida.

14. Defendant Contact Lens King, Inc. is a Nevada corporation authorized to do business in the State of Florida with a mailing address at 30 Lawrence Paquette Industrial Dr., Champlain, NY 12919. Contact Lens King sells contact lenses through their online retail store: https://www.contactlensking.com/. Contact Lens King sells contact lenses to consumers in the State of Florida and ships contact lenses to consumers in the State of Florida.

## III.   Jurisdiction and Venue.

15. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and the matter is a class action in which one or more members of the proposed class are citizens of a state different from the Defendants.

16. The Court has personal jurisdiction over each Defendant. Each Defendant's contacts with Florida are related to Plaintiff's causes of action against that Defendant, and give rise to those causes of action. As described below, each Defendant displays ads, in Florida, containing false and deceptive information about the pricing of contact lenses. Each Defendant does so for

financial gain: to sell more contacts and profit from those sales.  The ads are displayed to Florida consumers seeking to purchase contact lenses, including consumers who are deciding whether or not to purchase contact lenses from Plaintiff.  As a direct result of these ads, consumers in Florida decide not to purchase contact lenses from Plaintiff.  Those ads lead consumers in Florida to believe (incorrectly) that the contact lenses consumers are seeking to purchase are available at a substantially lower price.  And, based on this, consumers decide not to buy contact lenses from Plaintiff, and leave Plaintiff's store without buying contacts.  This harms Plaintiff in Florida, by depriving Plaintiff of contact lens sales it would have otherwise made to Florida consumers.

17.     Each Defendant purposefully availed itself of the privilege of conducting activities within Florida.  Each Defendant targeted its ads specifically to consumers in this state.  And each Defendant sold contact lenses to consumers in Florida, and shipped the contact lenses it sold into Florida.  These sales deprived Plaintiff of sales it would have otherwise made in Florida to Florida residents.

18.     The effects of each Defendant's conduct on Plaintiff were felt primarily in Florida. Plaintiff is located in Florida, and lost sales because of each Defendant's conduct in Florida.

19.     Venue is proper because a substantial portion of the acts, events, and/or failures to act giving rise to the claims occurred in this District.  Alternatively, venue is proper in this district because each Defendant is subject to personal jurisdiction in this District.

## IV.    Facts.

### A.    Contact lens purchases.

20.     About 45 million people in the U.S. wear corrective contact lenses. [1]  To obtain contact lenses, a consumer must visit an eye care professional such as an optometrist for a contact lens fitting, and obtain a prescription.  Once a consumer obtains a prescription, they can purchase

---

[1] https://www.cdc.gov/contactlenses/fast-facts.html#one

contact lenses.  Contact lenses are sold by eye care professionals such as Plaintiff, in retail stores such as Walmart, and online such as from 1-800-Contacts.com.

21.     Contact lenses are typically sold by the "box".  Each box of contact lenses contains enough contact lenses to last a certain amount of time.  For example, daily disposable contact lenses are often sold in boxes of 30 or 90 contact lenses.

22.     After a consumer visits an eye care professional's office for a contact lens fitting and obtains a prescription, the eye care professional will typically offer to sell the consumer a supply of contact lenses (usually a 6-month supply or a year supply).  Sales generated in this way are an important part of the eye care professional's business.

23.     Before deciding whether to purchase contact lenses from the eye care professional, many consumers research how the eye care professional's prices compare to those of online retailers. [2]  They do this, for example, on their smartphone while in the eye care professional's office. Based on this research, many consumers make purchasing decisions.  For example, if a consumer concludes that it would be significantly cheaper to buy the contacts they were prescribed online, they may choose not to purchase contacts from the eye care professional.  (They may also conclude that the eye care professional is overcharging them and decide not to make other purchases like glasses either).  When this occurs, it costs the eye care professional's sales.

**B.     Defendants' deceptive practices.**

24.     To compete for market share, online contact lens retailers extensively advertise their offerings online.  For example, a Google search for "1-day acuvue moist" generates the following

---

[2] Consumers have a legal right to shop around when buying contact lenses.  In 2004, Congress enacted the Fairness to Contact Lens Consumers Act.  The Act and its implementing regulations require contact lens prescribers to provide consumers with a copy of their prescription. And they prohibit prescribers from requiring consumers to purchase contacts from them before releasing the prescription.  *See* 16 CFR § 315.3; https://www.ftc.gov/business-guidance/resources/contact-lens-rule-guide-prescribers-sellers

search results, all of which are "Ads" [3]:



25.     Because consumers care very much about the price of contacts, pricing information
is prominently displayed on online ads for contact lenses.  This is shown above.

26.     Here is another example Google ad for Defendant Contact Lens King illustrating
this:

Ad · https://www.contactlensking.com/acuvue/moist90    ⋮    (800) 352-0255

1-day Acuvue Moist 90 Pack - Only $26.22 / box

Enjoy the comfort of fresh, clean disposable contact lenses every **day** with UV-Blocking

27.     Defendants are online retailers of contact lenses.  Each Defendant sells contact

---

[3] Similar ads are displayed when searching using other popular search engines such as
Microsoft Bing.

lenses manufactured by each of the major brands of contact lenses.  These include: 1-Day Acuvue Moist, 1-Day Acuvue Moist for Astigmatism, 1-Day Acuvue TruEye, Acuvue Oasys, Acuvue Oasys for Astigmatism, Air Optix Night & Day Aqua, Air Optix Plus Hydraglyde, Air Optix Plus Hydraglyde for Astigmatism, Bausch & Lomb Ultra, Biofinity, Biofinity Toric, Biotrue ONEday, Clariti 1-Day, Dailies AquaComfort Plus, Dailies Total 1, Focus Dailies, MyDay, Precision 1, Proclear 1 Day, SofLens Daily Disposable.

28.     Like other retailers, Defendants advertise their prices online and on their websites. Unlike other retailers, however, Defendants' statements about their pricing are not truthful.  The prices Defendants advertise are artificially low—far lower than the true price that consumers who buy from them ultimately have to pay for the advertised contact lenses.  Consumers cannot buy contact lenses from Defendants at the prices advertised.  So Defendants' advertisements are literally false: they state that a particular brand and type of contact lenses can be purchased at a particular price from the Defendant, but this is not true.

29.     Lured by Defendants' false statements, consumers decide to purchase contact lenses from Defendants, and not from other retailers such as Plaintiff and class members.

30.     For example, before purchasing contact lenses from eye care professionals such as Plaintiff, many consumers check to see if they can get a better price elsewhere by searching for the contact lenses they need on their smartphone from one of Plaintiff's locations.  Based on Defendants' ads, those consumers decide to leave the Plaintiff's store without purchasing contacts. They reasonably believe, based on Defendants' advertisements and website statements, that they can get a significantly better price by purchasing from Defendants.

31.     As a second example, consumers shopping online decide to purchase from Defendants rather than from other online retailers because they reasonably believe, based on Defendants' advertisements and website statements, they can get a significantly better price by

purchasing from Defendants.

32.     After deciding to purchase from Defendants rather than from Plaintiff and class members, consumers click on Defendants' ads which link to Defendants' websites. The websites then display the same prices displayed in the ads. Consumers add the contact lenses to their cart; fill in several forms with their name and address, their credit card information, and information about their prescription; and upload their prescription to Defendants' websites.

33.     But during the checkout process—usually at the very last screen, after the user has invested substantial time into the checkout process—Defendants tag on a substantial additional charge they label a "fee" or "processing fee." The "processing fee" is substantial and typically results in a final price that is approximately double the advertised price. This is not actually a fee for any service; it is a made-up charge that Defendants add to increase the price. And when these fees are factored in, the total cost of buying contacts from Defendants is essentially the same as the total cost of buying contact lenses from other retailers such as Plaintiff and class members.

34.     Many consumers do not notice that a "processing fee" is being added to their order. (As described in detail below, Defendants attempt to conceal that they are adding this fee to the order in a number of ways). Others mistakenly believe that all contact lens retailers charge similar "processing fees," and so they are still getting the best deal possible. And others still notice the previously undisclosed processing fee, but decide to go through with the purchase anyway: they have already invested substantial time and effort inputting their information into the Defendants' system, uploading their prescription, and so forth. So it doesn't make sense to start over on another site that does not charge processing fees (or return to their eye care professional's office). This is especially true because, after the "processing fee" is added in, the price is about the same as consumers would pay elsewhere. So there is no incentive to reverse course and buy elsewhere—there is only an incentive to buy from Defendants, be done with it, and avoid the burden of driving back to their

optometrist or re-entering all the necessary information on another website.  The false advertising has done its job and diverted the sale to Defendants and away from honest sellers like Plaintiff and class members.

35.    In any of these situations, the result is the same: a consumer who otherwise would have purchased contact lenses from Plaintiff or class members, purchases contacts from one of Defendants instead.  Sales that would have otherwise gone to Plaintiff and class members are diverted to Defendants.  Defendants profit; Plaintiff and the class lose profits.

36.    The following sections describe each Defendant's false advertisements and checkout process in detail.

### 1.    Defendant Glasses USA's deceptive conduct.

37.    Defendant Glasses USA owns and operates the website www.glassesusa.com. Defendant runs online ads for all major brands and types of contacts.  Those ads prominently advertise the per-box price.

38.    For example, Glasses USA's Google advertisements for a 90-pack of 1 Day Acuvue Moist Daily contact lenses are shown below.  The ad prominently advertises the price that Glasses USA charges for that box of contacts: $26.38.  In comparison, honest advertisers like Plaintiff and class members advertise the true price they charge for these same contacts, which is substantially higher.  For example, for this brand, honest competitors like EZContacts advertise a price of $45.95:



39.     If a consumer clicks on the ad shown above, Glasses USA also prominently displays that same pricing on its website.  For example, Glasses USA's page for the 1 Day Acuvue Moist Daily 90-pack is shown below [4]:

_____
    [4] https://www.glassesusa.com/1-day-acuvue-moist-90-pack/121-002513pla.html?affid=pla-lp872&gclid=Cj0KCQjwidSWBhDdARIsAIoTVb3QB__nGcjjBJJs2_rPeLMqw09Onq8fskXwxhquAPZJ2mM-PcDCsysaAsMzEALw_wcB



40.     A reasonable consumer would understand these statements to mean that it costs $26.38 [5] to purchase each box of 1 Day Acuvue Moist Daily 90-pack from Glasses USA.  This is the ordinary meaning of such statements about price in this context.  It is also what honest online retailers (like Plaintiff and class members) mean when they advertise prices.  No reasonable consumer expects that an advertised price is missing a made up "processing fee" that is going to nearly double the price.

41.     After a consumer clicks "Get Your Contacts" on the screen above, on the next screen, the user is asked to either upload a prescription or fill it in manually:

---

[5] Online prices are often displayed without sales tax added, because sales tax varies depending on the location of the purchaser which is not known to the seller until the consumer checks out.  So consumers in states that impose sales tax are accustomed to sales tax being added to their orders, and might expect sales tax to be added to this price.  But consumers are not accustomed to random additional fees being added.  So they do not expect any additional charges (beyond sales tax) to be added.



42.     Next, the consumer is asked to select the quantity of boxes:



43. Once the consumer makes a selection, the price for the selected number—still reflecting the advertised price per box—is displayed to the user:



44.     Next, after the consumer clicks "Buy Now," the consumer is asked to enter his or her shipping address and select a shipping speed:



45.    The consumer is then asked to enter his or her credit card or other payment information:



46.    And finally, the consumer is shown a "Review Order" page summarizing his or her purchase:



GlassesUSA.com | **Secure Checkout** 🔒

**Delivery & Billing** — Edit

Jane Doe, (123) 456-7891, jane.doe@gmail.com

123 Fake Ave, Fakesville, 90291, US

**Shipping method:** Standard, 7-10 business days (Free)

**Payment Information** — Edit

Credit Card Type: VISA
Credit Card Number: ***-2561
Expiration Date: 02/2024

**③ Review Order**

DigiCert SECURE

California Proposition 65 Warning

**1 Day Acuvue Moist ($103.96)**
Includes a $25.60 processing fee per box Learn more

Qty: **1+1**

Prescription & Item Details ⌄

Subtotal: $202.88 $103.96
Shipping (Standard - 7-10 business days - Shipping and handling) Free
Sales tax $0

Grand Total: $103.96

☑ Get $15 on your next purchase when you sign up to get marketing updates and promotions via email. View our Privacy Policy and CA Privacy Act

**Place Order**

✔ 100% Money Back Guarantee!

By placing this order, you agree to our Terms of Use & Privacy Policy

**Need Help?** 💬

Start Live Chat
We're here for you 24/7

Call Us 1-844-244-1186
Every day 7am - midnight ET

✔ 365 Day Warranty

✔ Free Shipping & Returns

✔ 100% Money Back Guarantee

17

47.     The "Review Order" page, however, does not display the pricing that had been displayed on Glasses USA's ads, on their webpage, or on previous screens throughout the checkout process.  Instead, the pricing is much higher.  For example, as shown above, after consistently stating that the price of each box of 1 Day Acuvue Moist is $26.38 (meaning that the cost of the order shown above consisting of two boxes should be $52.76) on the summary page, Glasses USA states that the "Grand Total" is $103.96 (almost double).

48.     The reason for this difference is that the "Grand Total" price "includes a $25.60 processing fee per box." [6]  This is disclosed in a small grey font in the middle of the page:



---

[6] This amount varies depending on the brand and type of contact lens, but is hefty and usually exceeds $20 per box.

18

49.     Only if a consumer notices this statement and clicks "learn more," does the following popup appears:



50.     This eleventh hour disclosure that the true price of the contact lenses being offered is double that which was advertised is the opposite of being "upfront" with consumers.  Many consumers do not notice the small-text disclosure or that the "Grand Total" on the very last page of Defendant Glasses USA's checkout page is more expensive than what was shown on Defendant's advertisements and webpage.  (Consumers typically buy multiple boxes at a time, noticing this would require them to perform mental math and realize that the total displayed is more than the product of the per-box price Defendant advertises and the number of boxes they purchased).  Those consumers go through with the purchase without realizing that they are being charged a price much higher than the advertised price that induced them to visit Glasses USA's website in the first place.

51.     Others mistakenly believe that all contact lens retailers charge this processing fee.  Those consumers, too, go through with the purchase without realizing that Glasses USA's honest competitors do not charge this fee.

52.     And finally, even in the group of consumers who notice the additional fee and realize that honest competitors do not charge the fee, it is perfectly reasonable to make the purchase

anyway.  This is because, with the fee added, Glasses USA's prices are comparable to (not more expensive than) those of its honest competitors.  Glasses USA even emphasizes this with its "price match guarantee."  In other words, although (contrary to what its ads represent) purchasing contact lenses from Glasses USA is not any *cheaper* than purchasing contact lenses from one of its honest competitors, it is not more *expensive* either.  And by the time the consumer is told the truth, the consumer is already deep into the ordering process and has entered much information.  They have already invested a lot of time and effort going through the checkout process.  So the only incentive is to continue with the purchase from Defendant (and not reverse course to buy elsewhere for the same price).  Defendant's false pricing has done its job and diverted the sale away from Plaintiff and class members and to Defendant.

53.     In addition, those who were tricked by Defendant's ads while at their eye care provider's office are no longer in the office, because they have to go home and enter in detailed information to get the final price.  So rather than starting from scratch on a different online service (or travelling back to their eye care provider's office), consumers just go through with the purchase on Glasses USA—even though they would not have purchased from Glasses USA but-for the false and deceptive ads.

54.     Worse, Defendant's own website reveals that the processing fee is a made-up scam designed to allow Defendants to advertise a lower price than its competitors and divert sales while actually charging the same as its competitors, and not a fee for any legitimate service Defendant provides in connection with the sale of contact lenses.  Indeed, Defendant charges this fee <u>only</u> when a consumer reaches Defendant's website by way of a deceptive ad advertising a fake low price, such as the ads shown above.  If, instead, a consumer goes directly to Defendant's website without comparison shopping and without being shown Defendant's deceptive ads—for example, by typing in www.glassesusa.com in his or her browser—then Defendant's website does not display an

artificially low price and then make up the difference through a "processing fee."  Instead,

Defendant just displays the true price from the start, and does not charge any processing fee.  For

example, if a consumer navigates directly to www.glassesusa.com rather than comparison shopping

for 1-day Acuvue Moist, then Defendant's website displays the true price of $57.89 per box (rather

than the $26.38 per box that Defendant initially displays to users who reach the site through

comparison shopping):



And during checkout, no "processing fee" is added.  This confirms that the "processing fee" is not

paying for any legitimate service.  It is simply a sham charge that enables Defendant to divert sales

from legitimate businesses such as Plaintiff by advertising artificially false prices for contact lenses.

### 2.   Defendant Lens.com's deceptive conduct.

55.    Defendant Lens.com owns and operates the website www.lens.com.  Defendant runs

online ads for all major brands and types of contacts.  Those ads prominently advertise the per-box

price.

56.    For example, Lens.com's Google advertisements for a 90-pack of DAILIES

AquaComfort Plus contact lenses are shown below.  The ad prominently advertises the price that
Lens.com charges for that box of contacts: $19.69.  In comparison, honest advertisers like Plaintiff
and class members advertise the true price they charge for these same contacts, which is substantially
higher.  For example, for this brand, honest competitors like EZContacts advertise a price of $36.95:



57.    If a consumer clicks on the ad shown above, Lens.com also prominently displays
that same pricing on its website.  For example, Lens.com's page for a 90-pack of DAILIES

AquaComfort Plus contact lenses is shown below [7]:



58.     A reasonable consumer would understand these statements to mean that it costs $19.69 to purchase each 90-pack of DAILIES AquaComfort Plus contact lenses from Lens.com. This is the ordinary meaning of such statements about price in this context.  It is also what honest online retailers (like Plaintiff and class members) mean when they advertise prices.  No reasonable consumer expects that an advertised price is missing a made up "processing fee" that is going to nearly double the price.

59.     After a consumer selects the number of boxes he or she wishes to purchase and clicks "Continue" on the screen above, on the next screen, the user is asked to either upload a prescription or fill it in manually:

----

[7] https://www.lens.com/contact-lenses/p-tw4ix/1-day-acuvue-moist/90-pack/?kw=&cpn=15462849041&gclid=Cj0KCQjw852XBhC6ARIsAJsFPN3XlIm9_4bUjeYiR0y8cvUW9EH92lDwPv8_5xZNmh-muYXd0UbGbGAaAjt7EALw_wcB



60.    Next, the consumer is asked to enter his or her doctor's name and address:



61.     After the doctor's name and address have been added, a summary of the consumer's

shopping cart is displayed to the user.  The price shown in the shopping cart still reflects the

advertised price per box (in the example below, $19.69):



62.     Next, after the consumer clicks "Go To Checkout," the consumer is asked to enter

his or her shipping address and select a shipping speed:



63.    Below this box—under the "Continue" button and below the visible display area on most standard computer and laptop monitors—an "Order Summary" is displayed.



64.     That "Order Summary" still displays the advertised price per box (in the example above, $19.69).  But then it also adds "taxes and fees" to the order that increase proportionally to the number of boxes in the order [8] and far exceed any sales taxes owed.  The result is that the actual cost of purchasing contact lenses from Lens.com is much higher than the price advertised on Defendant's advertisements—and comparable to the prices charged by Plaintiff and other honest competitors.

65.     If a user:

(1) notices this screen (which is hidden below the "Continue" button and which a consumer using a regular display or laptop must scroll down to see);

(2) notices the "taxes and fees" line

(3) notices that the amount that Defendant is charging in "taxes and fees" far exceeds any applicable sales taxes that would apply to the order; and

_____

[8] This amount varies depending on the box, but is hefty and usually exceeds $20 per box.

(4) clicks on the additional information button shown above,

then (and only then) the following popup is displayed.  No other information is provided.



66.    If the consumer presses "Continue," the following page is displayed:



67.    This page asks the consumer to select a payment option and fill in his or her credit

card or other information.  It also displays an "Order Summary."  Unlike the (hidden) screen on the prior page, however, this "Order Summary" does not break down the amounts being charged to indicate that hefty "fees" are being added to the order.  Only the "Order Total" is shown.

68.     Many consumers do not notice the hidden "taxes and fees" line item (or do not notice that the amount shown far exceeds any taxes that could possibly be applicable), and do not notice that the "Order Total" on the very last page is much higher than what it should be based on Defendant's advertisements and webpage.  (Consumers typically buy multiple boxes at a time, noticing this would require them to realize that the total displayed is more than the product of the per-box price Defendant advertises and the number of boxes they purchased).  Those consumers go through with the purchase without realizing that they are being charged a price much higher than the advertised price that induced them to visit Lens.com's website in the first place.

69.     Others reasonably, but mistakenly, believe that all contact lens retailers charge approximately the same amount of "taxes and fees."   Those consumers, too, go through with the purchase without realizing that Lens.com's honest competitors do not charge this fee.

70.     Finally, even in the group of consumers who notice the additional fee and realize that honest competitors do not charge the fee, it is perfectly reasonable to make the purchase anyway.  This is because, with the fee added, Lens.com's prices are comparable to (not more expensive than) those of its honest competitors.  In other words, although (contrary to what its ads represent) purchasing contact lenses from Lens.com is not any *cheaper* than purchasing contact lenses from one of its honest competitors, it is not more *expensive* either.  And by the time the fee is added to the order, the customer is already deep into the ordering process and has entered much information.  So by the time consumers discover the truth, they have already invested a lot of time and effort going through the checkout process.  The only incentive is to continue with the purchase from Defendant (and not reverse course and buy elsewhere for the same price).  Defendant's false pricing has done

its job and diverted the sale away from Plaintiff and class members and to Defendant.

71.     In addition, those who were tricked by Defendant's ads while at their eye care provider's office are no longer in the office, because they have to go home and enter in detailed information to get the final price.  So rather than starting from scratch on a different online service (or travelling back to their eye care provider's office), consumers just go through with the purchase on Lens.com—even though they would not have purchased from Lens.com but-for the false and deceptive ads.

### 3.     Defendant Web Eye Care's deceptive conduct.

72.     Defendant Web Eye Care owns and operates the website www.webeyecare.com. Defendant runs online ads for all major brands and types of contacts.  Those ads prominently advertise the per-box price.

73.     For example, Web Eye Care's Google advertisements for Biofinity 6 Pack contact lenses are shown below.  The ad prominently advertises the price that Web Eye Care charges for that box of contacts: $11.45.  In comparison, honest advertisers like Plaintiff and class members must advertise the true price they charge for these same contacts, which is substantially higher.  For example, for this brand, honest competitors like EZContacts advertise a price of $24.95 for the same box of contacts.



74.    If a consumer clicks on the ads shown above, Web Eye Care also prominently displays that same pricing on its website.  For example, Web Eye Care's page for the Biofinity monthly 6 Pack is shown below [9]:

---

[9] https://webeyecare.com/biofinity_6_pack/?sku=4383-6383r&utm_source=google&utm_medium=surfaces&utm_campaign=surfaces_on_google&utm_content=CooperVision&utm_term=6383r&gclid=Cj0KCQjw852XBhC6ARIsAJsFPN3j626E7Ge_ZJFfiXPp0KOp7ERaWbV3jnXMF3DU1qW0N6cKcy6bTgoaAtHrEALw_wcB



75.     A reasonable consumer would understand these statements to mean that it costs $11.45 to purchase each box of Bifinity 6 Pack contact lenses.  This is the ordinary meaning of such statements about price in this context.  It is also what honest online retailers (like Plaintiff and class members) mean when they advertise prices.  No reasonable consumer expects that an advertised price is missing a made up "processing fee" that is going to nearly double the price.

76.     After a consumer selects the supply he or she wishes to purchase and clicks "Add to Cart" on the screen above, on the next screen, the user is asked to either upload a prescription or fill it in manually (or otherwise skip this step and provide the prescription later):



77.     To enter his or her prescription, the consumer must fill in the fields shown below:



78.     After the consumer uploads or manually enters his or her prescription and presses "add to cart," a Shopping Cart and Order Summary page is displayed:



79.     The "Shopping Cart" pane repeats the same, low per-box pricing that is displayed on Web Eye Care's ads and website.  However, the "Grand Total" price displayed on the "Order Summary" pane does not reflect that pricing.  Instead, it is a higher amount.  For example, the "Grand Total" that a consumer must pay to buy a box of Biofinity 6 Pack contact lenses from Web Eye Care is approximately double what Web Eye Care's ads represent.

80.     The reason for this difference is that the "Grand Total" price includes a "processing fee" of $11.22 per box. [10]   This is disclosed in a small grey font:

---

[10] This amount varies depending on the brand and type of contact lens, but is hefty and usually exceeds $20 per box.



81.    The result is that, when the processing fee is added, the total cost of the contact lenses in the example above is roughly double the amount advertised.

82.    Only if a consumer notices the "processing fee" and clicks on the information box, the following pop-up appears:



83.    This hidden disclosure is the opposite of being "up front." To begin, consumers do not care what portion of the purchase price of the good they are buying is attributable to costs or overhead. They just care about how much the good costs them, and whether it is more or less than it would cost them elsewhere.

84.    Moreover, many consumers do not notice the small-text itemized "processing fee" or that the "Grand Total" is much higher than what was shown on Defendant's advertisements and webpage. (Consumers typically buy multiple boxes at a time, noticing this would require them to

37

realize that the total displayed is more than the product of the per-box price Defendant advertises and the number of boxes they purchased). Those consumers go through with the purchase without realizing that they are being charged a price much higher than the advertised price that induced them to visit Web Eye Care's website in the first place.

85.     Moreover, even for those who notice the additional fee and realize that honest competitors do not charge the fee, it is perfectly reasonable to make the purchase anyway. This is because, with the fee added, Web Eye Care's prices are comparable to (not more expensive than) those of its honest competitors. In other words, although (contrary to what its ads represent) purchasing contact lenses from Web Eye Care is not any *cheaper* than purchasing contact lenses from one of its honest competitors, it is not more *expensive* either. And by the time consumers discover this, they have already invested a lot of time and effort going through the checkout process. So the only incentive is to continue with the purchase from Defendant (and not reverse course to buy elsewhere for the same price). Defendant's false pricing has done its job and diverted the sale away from Plaintiff and class members and to Defendant.

86.     In addition, those who were tricked by Defendant's ads while at their eye care provider's office are no longer in the office, because they have to go home and enter in detailed information to get the final price. So rather than starting from scratch on a different online service (or travelling back to their eye care provider's office), consumers just go through with the purchase on Web Eye Care—even though they would not have purchased from Web Eye Care but-for the false and deceptive ads.

87.     Worse, Defendant's "processing fee" is a made-up scam designed to allow Defendants to advertise a lower price than its competitors and divert sales while actually charging the same as its competitors, and not a legitimate fee to cover "costs and overhead for validating your order and verifying it from your prescribing doctor."

88.    To begin, the fee increases in proportion to the number of boxes and varies depending on the contact lens you purchase (for each contact, in an amount just enough to make up the difference between Defendant's advertised prices and the true prices of honest competitors like Plaintiff and class members, who are upfront about their pricing in their ads).  But the costs and overhead associated with validating an order and verifying it from the prescribing doctor are the same regardless of how many boxes someone buys, or what brand of contacts they are buying.

89.    What's more, Defendant charges this fee <u>only</u> when a consumer reaches Defendant's website by way of a deceptive ad advertising a fake low price, such as the ads shown above.  If, instead, a consumer goes directly to Defendant's website without comparison shopping and without being shown Defendant's deceptive ads—for example, by typing in www.webeyecare.com in his or her browser—then Defendant's website does not display an artificially low price and then make up the difference through a "processing fee."  Instead, Defendant just displays the true price from the start, and does not charge any processing fee.  For example, if a consumer navigates directly to www.webeyecare.com rather than comparison shopping, and then adds the same Bioinfinity 6 pack contact lenses identified above, Defendant's website displays the true price from the start, and does not charge any processing fee[11]:

---

[11] In addition, the website does not offer rebates to customers who access the website directly.  This accounts for the additional difference in the price displayed.



90.      In other words, the processing fee that Web Eye Care charges is not a legitimate fee that Web Eye Care charges to cover "costs and overhead for validating your order and verifying it from your prescribing doctor" and itemizes separately to be "up front."  It is simply a sham charge that Defendant uses to justify charging higher prices to consumers who were lured in by Defendant's false ads that Defendant uses to divert sales from legitimate businesses such as Plaintiff.

### 4.      Defendant Contact Lens King's deceptive conduct.

91.      Defendant Contact Lens King owns and operates the website www.contactlensking.com.  Defendant runs online ads for all major brands and types of contacts. Those ads prominently advertise the per-box price.

92.      For example, Contact Lens King's Google advertisements for Air Optix Night & Day Aqua 6 Pack contact lenses are shown below.  The ad prominently advertises the price that Contact Lens King charges for that box of contacts: $20.47. In comparison, honest advertisers like

Plaintiff and class members must advertise the true price they charge for these same contacts, which is substantially higher.  For example, for this brand, honest competitors like EZContacts advertise a price of $46.95 for the same box of contacts.



93.     If a consumer clicks on the ads shown above, Contact Lens King also prominently displays that same pricing on its website.  For example, Contact Lens King's page for the Air Optix Night & Day Aqua 6 Pack is shown below:



94.     Once a consumer navigates to this page, to purchase contacts, a consumer must enter his or her prescription in the bottom portion of the screen.  When the consumer selects "Add to Cart," the following page is displayed:



95.     The consumer is then asked to either sign into his or her account or create an account, enter their shipping and billing information, and complete the order.

96.     Unlike the other Defendants, Contact Lens King states on the first page in the sequence (albeit in a small font) that "A processing fee will apply."  If a consumer notices this fee and clicks on the additional information box, the following explanation of the fee is provided:

A processing fee of $17.49 will apply per box.

Recently, we've noticed that our competitors have introduced and implemented this tool, used as a means of allowing their upfront display prices on various online advertising channels to appear more competitive. As we know, when a company advertises a lower price, there is increased traffic to their website. Upon the realization that this strategy was being used, we at Contact Lens King stood firmly against applying such a practice. However, in spite of the fact that we offer the lowest bottom line prices, we experienced a decrease in traffic and total orders. Through re-evaluation, and despite our discomfort, we have made the tough decision to adopt the practice as well. Contact Lens King is firmly committed to offering the lowest bottom line prices online, and we want our customers to rest assured that through us, you will always see significant savings in your pocketbook - even with the fee.

We totally understand that this additional fee can be frustrating, or even infuriating, but we invite you to compare our bottom line prices with our competitors'. We promise we won't disappoint you!

The price displayed for this item is the lowest price possible. No additional discounts are available even with a coupon.

**OK**

97.     This explanation confirms that Defendants (including Defendant Contact Lens King itself) are using the processing fee as a "tool" for "allowing their upfront display prices on various online advertising channels to appear more competitive" than they truly are.

98.     It also admits that the practice of displaying ads falsely indicating prices that are "more competitive" than they truly are results in "increased traffic to [the] website" of companies that do this; and diverts sales (i.e., results in a "decrease in traffic and total orders") away from honest companies that are truthful in their advertising.

44

99. And it acknowledges that using the strategy of falsely advertising artificially low prices gives Contact Lens King "discomfort," because this practice is deceitful and illegal.

100. In short, in trying to explain away its conduct, Defendant Contact Lens King is admitting that what it (and the other Defendants) is doing is deceptive, material to consumer's purchasing decisions, and wrong.

101. Moreover, even with statements about the processing fee early in the process, Defendant Contact Lens King's conduct is still deceptive and still diverts sales from honest businesses.

102. Many consumers do not notice the small-text description of the "processing fee" or that the "Grand Total" is much higher than what was shown on Defendant's advertisements and webpage. (Consumers typically buy multiple boxes at a time, noticing this would require them to realize that the total displayed is more than the product of the per-box price Defendant advertises and the number of boxes they purchased). Those consumers go through with the purchase without realizing that they are being charged a price much higher than the advertised price that induced them to visit Contact Lens King website in the first place.

103. Plus, even for those who notice the additional fee and realize that honest competitors do not charge the fee, it is perfectly reasonable to make the purchase anyway. This is because, with the fee added, Contact Lens King's prices are comparable to (not more expensive than) those of its honest competitors. Contact Lens King emphasizes this fact in its explanation of its processing fee. In other words, although (contrary to what its ads represent) purchasing contact lenses from Contact Lens King is not any *cheaper* than purchasing contact lenses from one of its honest competitors, it is not more *expensive* either. And by the time consumers discover this, they have already navigated to Defendant's website and—unless they notice the hidden disclosure of the fee on the first page—invested time and effort going through the checkout process. So the only

incentive is to continue with the purchase from Defendant (and not reverse course to buy elsewhere for the same price).  Defendant's false pricing has done its job and diverted the sale away from Plaintiff and class members and to Defendant.

104.    In addition, those who were tricked by Defendant's ads while at their eye care provider's office are no longer in the office, because they have to go home and enter in detailed information to get the final price.  So rather than starting from scratch on a different online service (or travelling back to their eye care provider's office), consumers just go through with the purchase on Contact Lens King—even though they would not have purchased from Contact Lens King but-for the false and deceptive ads.

\* \* \*

105.    The advertisements and checkout processes above for each Defendant are representative of Defendants' advertisements and check out processes for each major brand and type of contact that Defendants sells.

106.    Defendants' statements about their prices, in their advertisements and on their webpages, are false and deceptive and misrepresent Defendants' prices.

107.    Defendants' statements are literally false: they state that a particular brand and type of contact lenses can be purchased at a particular price from the Defendants, but this is not true. And the large "processing fee" that Defendants tag on is nothing like any additional fee that consumers would reasonably expect to be added to the advertised price, like a small shipping and handling fee.

108.    Defendants' statements have the capacity to deceive, and actually do deceive, consumers.  Consumers reasonably believe, based on Defendants' statements, that they will be able to buy the advertised contact lenses at the advertised prices (plus applicable taxes) from Defendants. But in truth, they cannot; consumers have to pay approximately double the advertised price to

purchase contact lenses from Defendants.

109.     Defendants' statements are material to consumers' purchasing decisions.  As described above, consumers care very much about the price of contacts and specifically seek this information out when deciding where to purchase their contacts.  Defendants' false statements about their pricing cause consumers *not* to purchase contacts from class members including Plaintiff. And they cause consumers to purchase contacts from Defendants instead of from class members including Plaintiff.

**D.     Defendants' deceptive advertisements diverted sales away from Plaintiff and harmed Plaintiff's reputation.**

110.     Plaintiff Vision Unlimited offers optical services at seven locations in Coral Gables, Weston, Doral, Kendall, Kendallwood FIU College, and Biscayne.

111.     Plaintiff offers contact lens fitting services to clients.  Plaintiff also sells contact lenses.  The sale of contact lenses is an important part of Plaintiff's business.

112.     Patients come into Plaintiff's offices to receive an eye exam and a contact lens fitting.  As required under the applicable FTC regulations, after completing each patient's eye exam, Plaintiff provides a copy of the prescription to that patient.  Plaintiff also verifies its patients' prescriptions promptly if requested by other contact lens retailers.

113.     Plaintiff first became aware that Defendants were advertising deceptively low prices for competitive contact lenses when patients started to complain about Plaintiff's contact lens prices.

114.     Here is a typical scenario of how Plaintiff loses a contact lens sale: a patient asks for a price for a particular contact lens, for example, 1-Day Acuvue Moist lenses.  After Plaintiff's staff tells the patient the price, the patient takes out their smartphone and Googles "1-Day Acuvue Moist" and finds Defendants' ads stating that Defendants sell the same contact lenses for a much lower price.  Then the patient complains that Plaintiff's store is "overcharging" and "too expensive" since they believe that she can get the same product online for half the price.  Plaintiff's staff often

tries to explain to these patients that the advertised price is not the true price.  However, because Defendants do not reveal their true prices until late in the checkout process, and only after a consumer enters personal information, it is often too difficult to demonstrate that the ads are false. Consumers leave the store without purchasing contacts.  In addition, some customers simply look up the price of contacts before coming to the office, or without telling Plaintiff's staff.  For those customers, Plaintiff has no opportunity to explain that Defendants' advertised prices are false. Worse, because Defendants' ads for contact lenses lead consumers to incorrectly believe that Plaintiff is "overcharging" them for contact lenses, they do not purchase anything else (such as glasses) from Plaintiff either, reasonably believing that Plaintiff's prices are not competitive across the board.

115.    Plaintiff has been harmed by Defendants' advertisements.

116.    Plaintiff has lost sales and market share due to Defendants' conduct.  As a direct result of Defendants' advertisements, patients who would have otherwise bought contact lenses from Plaintiff left Plaintiff's stores without purchasing contacts, believing (incorrectly) that they could obtain those same contacts at a better price by ordering them online from Defendants.  In addition, believing (incorrectly) that Plaintiff's prices were not competitive, patients did not buy other products (such as glasses) from Plaintiff either.

117.    Moreover, Plaintiff's reputation and goodwill were damaged as a result of Defendants' advertisements.  Based on those advertisements, customers and potential customers of Plaintiff incorrectly believed that Plaintiff was charging a lot more for contact lenses than his online competitors were.  This was damaging to Plaintiff's reputation and goodwill.

**E.    Class action allegations.**

Proposed class

118.    Plaintiff brings the asserted claims on behalf of the proposed class of: all persons

(including companies) residing in the United States who (1) sold in the United States (2) any contact lenses that (3) at the time, were also sold by any Defendant subject to a "processing fee" or similar hidden fee (4) during the applicable statute of limitations period.

119.    The following people are excluded from the Class: (1) any Judge or Magistrate Judge presiding over this action and the members of their family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel, and their experts and consultants; and (6) the legal representatives, successors, and assigns of any such excluded persons.

Numerosity

120.    The proposed class contains members so numerous that separate joinder of each member of the class is impractical.  There are thousands of proposed class members.

Commonality

121.    There are questions of law and fact common to the proposed class.  These include, without limitation:

- Whether Defendants' advertisements were false and misleading;

- Whether the advertisements deceived consumers, or had the capacity to deceive them;

- Whether the deception had a material effect on purchasing decisions;

- Whether Defendants' advertisements diverted sales from Plaintiff and class members to Defendants;

- Whether Defendants' conduct violated section 43(a) of the Lanham Act.

<u>Typicality</u>

122.    Plaintiff's claims are typical of the proposed class.  Like the proposed class, Plaintiff

sells contact lenses.  Like the proposed class, Plaintiff lost business to Defendants as a result of

Defendants' deceptive advertisements.

<u>Adequacy</u>

123.    Plaintiff can fairly and adequately represent the proposed class and subclasses.

Plaintiff has no conflict of interest with other class members, and has retained counsel who are

competent and experienced in class action and unfair competition litigation.

<u>Classwide injunctive relief</u>

124.    Defendants have acted or refused to act on grounds that apply generally to the class,

so that final injunctive relief is appropriate respecting the class as a whole.

<u>Predominance and Superiority</u>

125.    The prosecution of separate actions by individual members of the proposed class

would create a risk of inconsistent or varying adjudication with respect to individual members,

which would establish incompatible standards for the parties opposing the class.  For example,

individual adjudication would create a risk that the same conduct is found to be a violation of

section 43(a) of the Lanham Act for some proposed class members, but not others.

126.    Common questions of law and fact predominate over any questions affecting only

individual members of the proposed class.  These common legal and factual questions arise from

certain central issues which do not vary from class member to class member, and which may be

determined without reference to the individual circumstances of any particular class member. For

example, a core liability question is common:  whether Defendants' conduct violated section 43(a) of

the Lanham Act.

127.    A class action is superior to all other available methods for the fair and efficient

adjudication of this litigation because individual litigation of each claim is impractical.  It would be unduly burdensome to have individual litigation of millions of individual claims in separate lawsuits, every one of which would present the issues presented in this lawsuit.

## VI.    Causes of Action.

### Count I: Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A)
### (against each Defendant; on behalf of Plaintiff and the Class)

128.    Plaintiff incorporates by reference each and every factual allegation set forth above.

129.    By engaging in the conduct described above, each Defendant violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).  In connection with contact lenses and the online sale of contact lenses, each Defendant used in commerce false or misleading descriptions of fact and false or misleading representations of fact, that in commercial advertising or promotion, misrepresented the characteristics and qualities of Defendants' and class members' goods, services, and commercial activities.

130.    Each Defendant's advertisements about the price of their contacts were false and misleading.  Defendants' advertisements stated that the advertised contact lenses were available for sale from that Defendant at one price, when in truth they were never available for sale at that deceptively low advertised price.  Likewise, each Defendant's advertisements indicated that it was significantly cheaper to buy contact lenses from that Defendant than from class members, but this was not true.

131.    Each Defendant's advertisements had the capacity to deceive, and actually did deceive, consumers.  Defendants' advertisements had the capacity to lead consumers to believe, and actually did lead consumers to believe, that the advertised contact lenses were available for sale from that Defendant at one price, when in truth they were only available for sale at a much higher price.  Likewise, Defendants' advertisements had the capacity to lead consumers to believe, and actually did lead consumers to believe, that Plaintiff and class members' prices were higher than Defendants'

prices, when in fact this was not true.

132.    The deception had a material effect on purchasing decisions.  Price is an important characteristic of contact lenses that consumers pay close attention to when deciding where to purchase their contacts.  Consumers decided to purchase from Defendants rather than from class members, including Plaintiff, specifically because of Defendants' false representations about the price of its contacts.  Moreover, Defendants' advertisements caused consumers to purchase from Defendants rather than from Plaintiff and class members.

133.    The misrepresented contact lenses affect interstate commerce.  Each Defendant advertises its contact lenses across state lines and sells contacts in interstate commerce.  In addition, Defendants' deceptive advertising resulted in contact lens sales being diverted from eye care professionals and other contact lens retailers in other states.

134.    Plaintiff and class members were likely to have been, and actually were, injured as a result of Defendants' false advertising.  As described above, as a direct result of Defendants' false advertising, Plaintiff and class members lost and are continuing to lose sales and, therefore, revenues, profits, and market share.  In addition, Defendants' false advertising caused consumers to believe that Plaintiff and class members were overcharging for contact lenses.  This injured Plaintiff and class members' reputations and harmed their goodwill, and this harm is continuing.

135.    The continuing loss of reputation, goodwill, and market share cannot be properly calculated and thus constitutes irreparable harm and an injury for which Plaintiff and the class members have no adequate remedy at law.  Plaintiff and the class members will continue to suffer irreparable harm unless this Court enjoins Defendants' conduct.

## VII.    Prayer for Relief.

Plaintiff seeks the following relief for itself and the proposed class:

- An order certifying the asserted claims, or issues raised, as a class action;

- A judgment in favor of Plaintiff and the proposed class;

- Disgorgement of any and all income in connection with the online sale of contact lenses, and other just equitable relief;

- Damages, including actual, statutory, treble, and punitive damages where applicable;

- Restitution;

- Pre- and post-judgment interest;

- A preliminary injunction prohibiting Defendants' deceptive conduct, as allowed by law;

- A permanent injunction prohibiting Defendants' deceptive conduct, as allowed by law;

- Reasonable attorneys' fees and costs, as allowed by law; and

- Any additional relief that the Court deems reasonable and just.


Dated: August 10, 2022                    Respectfully submitted,

                                          **DAPEER LAW, P.A.**

                                          */s/ Rachel Dapeer*
                                          Rachel Dapeer
                                          Florida Bar No. 108039
                                          20900 NE 30th Ave., Suite 417
                                          Aventura, FL 33180
                                          Telephone: 305-610-5223
                                          *rachel@dapeer.com*

                                          **DOVEL & LUNER, LLP**

                                          Simon Franzini
                                          Cal. Bar No. 287631*
                                          201 Santa Monica Blvd., Suite 600
                                          Santa Monica, California 90401
                                          Telephone: 310-656-7066
                                          *simon@dovel.com*

*Pro Hac Vice* application forthcoming

*Counsel for Plaintiff and the Proposed Class*